No. 839

First Circuit

ILLINOIS CENTRAL R. R. CO. v.
NATIONAL SAND & GRAVEL CO., INC.

(October 7, 1931. Opinion and Decree.)

Carroll Buck, of Amite, attorney for plaintiff, appellee.

S. S. Reid, of Amite, attorney for defendant, appellant.

LeBLANC, J. This suit originally involved two claims by the plaintiff railroad company against the defendant, one being for freight charges on a certain locomotive and tender from Amite, La., to McComb, Miss., on November 8, 1929, and back over the same route on November 13, 1929, and the other to cover an undercharge on dredge pipe from Middleton, Ohio, to Amite, La., on January 18, 1928. The freight charges on the locomotive, both ways amounted to $139.06 and the undercharge claim to $121.76. The record discloses that this latter amount was paid on the very day that this suit was filed, but before service had been made. It is therefore no longer an issue in the case.

A solution of the controversy over the freight charge on the locomotive will depend on the construction that is to be placed on the agreement under which it was sold by the plaintiff to the defendant, as the defense to this action is based entirely on the ground that, at the time it was sold, plaintiff agreed to overhaul and recondition it before delivery, but that this had not been done, and, as it was necessary to send it back to McComb for this purpose, the freight charges should be borne by the plaintiff.

The defendant, under protest, so it alleges, paid the plaintiff $215, which was the estimate of the repairs that were to be made to the engine, of which amount plaintiff refunded the sum of $22.09, and it claimed in reconvention the difference or the sum of $192.91.

The lower court gave judgment in favor of the plaintiff for the freight charges claimed, and rejected the defendant's reconventional demand, whereupon the latter took this appeal.

The defendant is engaged in the sand and gravel business, operating near Amite, La. In October, 1928, it became necessary

for them to rent an engine, as theirs was out of commission. Their manager, Mr. Whitman, rented a locomotive from the plaintiff company at a rental price, as we understand him to say, of $47 per day. At the time he made this arrangement with Mr. McLaurin, superintendent of the Louisiana division of the plaintiff railroad company, he asked him to secure a sale price for the engine. Plaintiff had several other secondhand engines for sale which McLaurin considered would be a better buy for defendant, at the same price, and further negotiations led to the closing of a deal for the locomotive involved in this suit for the price of $3,500 cash. The exact date of the sale is not shown, but it appears reasonably certain that it was either the last day of November or the very first days of December, 1928, that Mr. Whitman and his wife, accompanied by Mr. Evans, their engineer and his wife, drove to Monticello, Miss., with Mr. McLaurin to look at the locomotive. Mr. Whitman, who saw his company faced with a rather large bill for the rental of the other engine, conceived the idea of getting that amount remitted if he could, and accordingly asked McLaurin if he would not agree to a remission of the amount then due. McLaurin, whose authority was limited to the sale of the engine at the price of $3,500 told him that he would have to get instructions from his superiors before he could give him an answer. Several days afterwards he received authority to close the deal on the terms requested by Whitman, and the sale was completed; plaintiff contending that it was with the understanding that the engine was sold as it stood and defendant that the agreement further contemplated an entire overhauling and reconditioning of the locomotive.

At this time it may be pertinent to re-mark that the price of a new engine of this type would be as much as $20,000, or $25,000. Defendant had used the rented engine from October to the last days of December. At the price charged, it is apparent that quite a large rental bill had already accrued. When it is considered that that amount, whatever it was, was remitted in the final closing of the sale of the other engine, it would seem that they had obtained quite a good bargain, even though the engine they bought was secondhand.

The defendant charges the long delay in the delivery of the locomotive as an attempt on the part of the plaintiff to lull them into a belief that the engine was being overhauled, as indeed they contend it had bound itself to do. But the explanation of Mr. McLaurin to the effect that all this time he was waiting for instructions to waive the rent on the other engine, as requested by Mr. Whitman, as that was a matter beyond his authority, strikes us as being most plausible. During that time, the engine was brought over from Monticello to McComb, where it underwent the usual inspection and the initials of the defendant company substituted for those of plaintiff, as had been agreed upon.

Shortly after the delivery of the locomotive to the defendant, some trouble developed, and McLaurin, to satisfy Whitman, so he says, sent a man to Amite to make the necessary repairs. These, as it appears to us, were minor adjustments to the bearings, made necessary most probably because of different track conditions. About a month after other repairs became necessary, and, as there were better facilities for handling the job at the yard of the Natalbany Lumber Company at Natalbany, La., the engine was taken there and the repair work done. It seemed to have been a job that required only a day's work, so

these could not have been extensive repairs. Plaintiff seems never to have been informed of these repairs, and it appears certain that they never were called on to pay the expenses incurred.

After these last repairs which were made at Natalbany, the engine was put into regular service and used for practically ten months, when it began to lose power and could not do the required work properly. Defendant communicated with McLaurin about sending the engine to McComb for attention and repair. The latter, because of the press of work in their shops, agreed to undertake the job only on condition that defendant give them their certified check for $215, the amount to cover the estimate of the work to be done. The check was sent and the work was completed for $192.91, which was $22.10 less than the estimated price, and this latter amount was refunded to the defendant.

These last repairs made at McComb in November, 1929, amounted to considerably more than minor adjustments, but, if we are to believe the testimony of the general foreman of plaintiff railroad company who made or supervised them, they were but those made necessary from the natural wear and tear that accrues from almost a year's service. Had these been the repairs and reconditioning of the engine which the defendant contends plaintiff had obligated itself for, it is difficult to believe that defendant would have paid for them, in advance, without a protest of some sort. Their explanation that they made the payment under compulsion, because without the engine they could not operate, is weakened by the testimony of Mr. Whitman himself, who, in an effort to disprove the charge that the repairs were the usual ones made necessary for normal wear, says that their plant had not been operating every day. "We haven't been running every day, by any means," he insists on saying.

It is rather significant that defendant never made any demand whatever on the plaintiff for the return of the $192.91 which they had paid for the repair work done in November, 1929, and that they further paid the claim of $121.76 for an undercharge without protest or calling attention to the fact that plaintiff owed them the repairs.

All of the circumstances in the case tend to support Mr. McLaurin's positive denial of the testimony of Mr. and Mrs. Whitman and of Mr. Evans that the engine was to be overhauled and reconditioned before delivery. His letter to Mr. Whitman on November 17, 1928, at the time negotiations were going on for the sale of the engine, indicates that such work never was contemplated, as in it he states that he is advised that he can let him have the engine for the cash price of $3,500, "in its present condition." Moreover, the invoice sent to defendant from plaintiff's Chicago office specifies a sale of the engine "as is," meaning, of course, in the condition it was when sold. This invoice, Mr. Whitman states, was not received until after the delivery of the engine. He says further that, had it been given to him before or at the time of delivery, he would not have accepted the locomotive. The fact remains, however, that he did receive the invoice, and must have noticed the stipulation it contained, and yet he kept the engine without a word of protest or complaint.

The district judge seems to have carefully weighed all the facts and circumstances in the case, and his judgment in favor of the plaintiff for the freight charges claimed and rejecting the defendant's reconventional demand appears to us to be correct, and' it is therefore affirmed.